Ready to call our case, which is Mallet & Co v. Lacayo et al. And we'll go ahead and Mr. Hicks, we'll turn the podium, the metaphorical podium over to you. Do you want to reserve any time for rebuttal? Yes, Your Honor, two minutes. Okay, done. You may begin. May it please the Court, my name is Ron Hicks. I represent Sanova and Russell T. Bundy Associates. Appellates Otto Lacayo and William Chick Bowers are also parties to these consolidated appeals. Ms. Lacayo is representing herself and Mr. Bowers is represented by attorneys Katie Goldman and Nicholas Bell, but I will be handling the argument for all of those appellants. Your Honors, this appeal concerns the entry of a preliminary injunction that is not narrowly tailored to address any alleged irreparable harm concerning the appellee's purported confidential information that previously was an appellant's possession. Are you more concerned with the scope of the injunction or are you contesting, seem to be contesting the basic findings as well? That's correct, Your Honor, it's both. We are contesting both the scope as well as the basic finding. Your Honor, this is a situation in which there is no evidence of a actual proven trade secret that was actually misappropriated or used by any of the appellants. Let me ask you a question on that point. I want to make sure I have a basic understanding before we get into a more detailed discussion of trade secrets. You know, I remember my high school chemistry, you know, when I hear formula, that's what I think of, I think of, you know, doing a chemical reaction formula, right? Where, you know, whatever sodium, chloride, the other entries on the periodic table. Now, if I'm understanding your case correctly, that's not what we're talking about here. We're talking more about what are the components of a formula, more like what do we put into a recipe? Am I thinking about it the right way? You're directly on point, Your Honor. What we're talking about here is, in its simplest terms, cooking oil. Well, but it's more than just cooking oil, right? I mean, there's formulations. You've asserted that some of what Mallet does, and by the way, am I saying the name of the company right, Mallet? Yes. I see Ms. Presley shaking her head yes too, okay. But some of what Mallet does is just buy stuff from other producers and repack and put their name on it and sell it. But there, it is pretty clear from the record, isn't it, that they also do some other things, formulate some things, and that they don't tell everybody what those formulas are, right? That's correct, Your Honor. But doesn't the DTSA define a trade secret as information that the owner has taken reasonable steps to keep other people from knowing and that has economic value by virtue of the fact, I think the way it puts it is, information derives independent economic value and actual or potential value from not being generally known and not being readily ascertainable. Now, that's the definition, and certainly Judge Bassoon thought there was enough of that there, enough evidence of that there to enter a preliminary injunction. So, when you say there's no evidence at all, is that accurate? Yes, Your Honor, because we previously, if you look at the record, Mallet never defined what- Oh, we've looked at the record. Well, so, Your Honor, where did Mallet ever define which particular formula it claimed that my clients misappropriated? They don't. Instead, what they point to are 125 pages of material safety data sheets, which are publicly available information that were actually obtained off of Mallet's website. That's what Judge Bassoon said was information. That's the information that she claimed was the formulas. I thought she distinguished between two aspects of that information, that there were some that were publicly available and others that were not, and she classified it as trade secrets. No, all of the material safety data sheets are publicly available sheets. They were all obtained off of Mallet's website. In fact, actually, during the discovery, they didn't even realize that their website was still publicly available. During the depositions is when they realized it because we asked them about it and showed them that, in fact, all these material safety data sheets that they alleged constituted their trade secrets were publicly available. Let me ask you this question, counsel, which I think gets to what I'm concerned about and what both of my colleagues have just alluded to. Let's just take one of the formulas. There's a formula for Vegalube. I'm going to give you a particular scenario and tell me if this scenario had occurred here, would you deem Vegalube a Yes. Okay. I'm going to read a list of them. If I'm reading too fast, tell me and then think about it and tell me whether in that scenario it would be a trade secret. Talking about Vegalube just as an example. Let's say it's my company rather than Mallet. If I maintain the formula on a secure computer system, if I limited access to the computer system to only those people who needed the formula to make it, if I do not share product specification sheets with the public, if I require customers who request C of As to sign a confidentiality or a non-disclosure agreement, if I test to see whether Vegalube could be reverse engineered, if I train employees on the importance of Vegalube and the need to maintain secrecy, if I never allow employees to discuss Vegalube using personal emails or personal electronic devices, and last, if I provide detailed information to the court on the exact amount of time and money expended in developing the formula for Vegalube, would you agree that if all of those items that I've just discussed had occurred, that there would be an argument that the formula for Vegalube is a trade secret? I would agree with that, provided that the formula of Vegalube was provided to the court. And that's one of the primary issues here, as well as the fact that all of those things that you just provided in a list were not in the evidence. In fact, the evidence was quite to the contrary. People with first-hand knowledge testified that the Vegalube formula was well known in the industry and, in fact, was acquired by MALA. Well, hold on just a moment. Mr. Hicks, when you say it's contrary to evidence, now you're getting into the merits of whether the judge was clearly erroneous or not. But now we're not talking about whether there's no evidence. And that, in fact, goes to the question of jurisdiction, because you've asserted there's no jurisdiction in this even though the Defend Trade Secret Act is explicit in granting jurisdiction. Your Honor, our position is that we've asserted this, actually, from the beginning, that there was no evidence of a trade secret because MALA has not specifically defined what it constitutes its trade secret. And to this day, they have not defined what they constitute. They've not offered the formula into evidence. Our position is that until that happens, the federal court can't say that it has jurisdiction. So your legal position is if they don't tender a formula, like a written form, if they don't send the recipe in, there's no jurisdiction. That's the legal position you're taking? That's our position in terms of, yes, they have to tender. Do you have any authority for that? It's true that they have to identify their trade secrets, but do you have any authority for the assertion that if they don't send in a document that says, here's the trade secret, two spoons full of that, three spoons full of sugar, that there's just no jurisdiction to consider the case? We believe that that is the minimum requirement. That's an issue that has not yet been addressed by the courts, but I believe in a situation, particularly in this case here, where there is no diversity of jurisdiction. They have another revenue. There doesn't have to be diversity of jurisdiction. If there's federal question jurisdiction, if the DTSA applies, there's jurisdiction, right? I understand that, but I think Judge Sirica had a question for you. Well, this goes to the reverse engineering concept. Have any other competitors in this field copied the veggie lube formula by reverse engineering? Your Honor, the testimony was that it is common practice in this industry for everyone, including mallet, to get their competitors' products and reverse engineer them in their labs. That's how this market works. Everybody obtains everybody else's products and then reverse engineers to determine- Are there other identical products to veggie lube from other competitors? Yes. Yes. Identical. Identical. Everybody goes around and tries to basically market their products to the customers and the customers make the decision as to whether or not they want to reverse engineer. Certainly, people want to reverse engineer if they can. That's recognized as a legitimate thing, right? Reverse engineering, we don't frown on that. Here, the assertion is that your clients didn't reverse engineer. They just stole it. If a company chooses to steal information instead of reverse engineering- Now, I understand on behalf of your clients, say we didn't do that, but assume for the sake of argument that we're talking about a theft, a theft of information rather than a reverse engineering. Assuming that the other aspects of a definition of trade secret were met, that is that it had independent economic value from being kept secret. Does the fact that perhaps it could have been reverse engineered make the theft not a misappropriation? I would think in this case here, Your Honor, one of the things we even offer- Don't go into this case. Deal with my hypothetical, please. I think the fact that it can be reversed engineer, even if it's proven to be that it was a theft under the Pennsylvania Supreme Court decisions, which indicate that reverse engineering indicates that it's no longer a trade secret at that point. Well, stick with the DTSA, okay? Stick with the Defend Trade Secrets Act. The Defend Trade Secret Act says if it's readily ascertainable, then maybe it's not a trade secret. Assume that it's not readily ascertainable. It takes real skill and hard work and some luck to do this reverse engineering. The fact that ultimately you might be reverse engineered, it's still a trade secret. I think the fact that it can be reversed engineered, even if stolen, removes it from the DTSA and also under the Pennsylvania Trade Secret Act because it's readily available. I'm sorry, Your Honor. I'm sorry. That's part of- Please finish. Sorry. That's part of- And that's part of also Pennsylvania law. I mean, Pennsylvania law basically was actually in place before the DTSA, but both of them provide that if it's readily available and can be reverse engineered, it's not a trade secret. And on top of that, this information was publicly available and has been known for years. I mean, there are numerous patents out there, some of which have been even provided and filed by Mallet itself, which discloses not only the ingredients, but the formula for Vegalube. Are you saying the formula for Vegalube is in a patent or in a printed publication? Well, the ingredients might be, but the ingredients for everything are out there in the world, right? By definition, like Judge Greenaway referenced the periodic table. But listen, the question is, is the formula for Vegalube out there? Is the formula for other things that they say are proprietary and secret information like their internal manuals, their production, the way they manage production, internal information that they keep secret regarding pricing, those sorts of things. The things that Judge Bassoon listed, those aren't in patents or in printed publications, are they? Some of that information is, and some of it also has been provided to customers. And so it's been, I would call that publicly available. But the, is the precise formula that Mallet is using today for its customers currently known? According to Mallet, the general formula is generally known, but the precise formulas that they have customized over the years for particular customers is not known. But there's no allegation in this case, and there's no evidence in this case, that we have used that formula or that we even know what that formula is. Yeah, but why, if all of this was readily available on public information, why did your client solicit this information specifically on... Your Honor, I know it's my time. Oil, on the formulas of the oil and all of the other items that Judge Greenaway and Judge Jordan had laid out here this morning. Your Honor, I know it's my time. Can I have permission to answer your question? Yes, please. Please answer. First off, we deny that we solicit, you know, my client solicited any information. The information that Mr. Bundy testified to was information that was generally available information regarding various products and how they are to be used. And the information shows that he was asking for that information just to determine what the general knowledge would be in order to help facilitate with regard to asking, providing information in terms of figuring out, okay, what products does he need to purchase and the like. But he never, and there's no evidence we've ever used any formula as a mallet. In fact, we offered repeatedly to have our products tested with mallets products to in fact show that the products are not the same, that the formulas are not the same, that the ingredients are different. And again, just to point out one of the things, you know, there are two different types of products here. There are formulated products and then there are mineral oils that are just purchased and nobody formulates. Yeah, the mineral oil things, let's take those off the table. Judge Greenway, you had a question. Yeah, I do. And thank you so much. So we've been focusing on trade secret and the misappropriation of trade secrets assertion. So let's put that aside for a moment. And I want to know your position on the breach of contract. Now, the claim is that your clients disclose mallets internal information. And the assertion is that Mr. Bowers shared many emails, including client concerns and complaints. That sharing of internal information and those specific allusions to sharing emails, doesn't that support the breach of contract so separate and apart from trade secrets for a just on the breach of contract? Well, with regard to I would argue no, your honor. First off, the context in which that information was provided by Mr. Bowers was being shared with a co salesperson at the time. You know, at that time in 2019, American Pan was a actually a marketing partner. And in fact, that's where Mallet acquired many of the customers that it's now claiming are its own. They actually acquired it from the Bundy organization. And Mr. Bowers was basically talking to a fellow sales organization that was also supporting Mallet and basically talking about the fact that customers were complaining about the product. The information he shared was already known to Bundy because of their status of working as a co salesperson for Mallet and was not confidential information that Mr. Bowers had shared. Moreover, if you look at the contractual basis, and I'm glad you brought this up with regard to both Ms. LaCaya and Mr. Bowers, as we sit here today, there are no restrictive covenants in place with regard to either of those individuals. Ms. LaCaya's restrictive covenant expired in February of this year. She was under that covenant when she went to work. That's correct. She did, but there's nothing in the covenant which extended it. And, you know, part of the problem here is, and then we, that's, these were part of the issues that we raised early on, was that Mallet was aware that all of this information was in Ms. LaCaya's possession in 2018 when she left, when she was let go or when she resigned. And they did nothing about it. Right. Well, I'm not sure they did nothing about it, but Judge Surica, go ahead, please. Wasn't there a cease and desist order? They sent out a cease and desist letter and then did no follow-up afterwards. Okay. Well, that's not nothing, but we've had you speak for some time here. We'll give your colleague here on the other side an additional five minutes if she'd like that, and then we'll have you back on rebuttal for your two minutes, Mr. Hicks. Thank you. Thank you, Your Honor. Ms. Presley. Good morning, Your Honor. May it please the court. Marla Presley on behalf of Appalese. Your Honors, the finding that Robert Bundy, with the help of Otto LaCayo and Chick Bowers, orchestrated a scheme to misappropriate Mallet's trade secrets is supported by a 13,819 page record and the testimony from 10 witnesses. Well, let's, let's dive right in. And at the first point, even if we thought that the defendants had sort of stretched to the point of maybe spraying in a hamstring by saying there's no jurisdiction based on the allegations and the complaint and the evidence deduced at the preliminary injunction hearing, isn't it indeed the case that to get a preliminary injunction, you need to show, you need to tell what the trade secret is. Now, when I look at Judge Bassoon's order, what I read are things like highly sensitive materials about how Mallet produces markets and sells its release agents, which is pretty broad and vague. And then I read 13 or so things that she calls, quote, protected materials, Mallet's formulas, customer purchase orders, identification of customers having difficulty, internal discussions of major problems, internal discussions of how Mallet would address the problems, internal discussions of preferences. Mallet's completed organic certifications. I have no idea what that means. Supply sources, pricing and volume data, information about equipment. Now, you know, how, how, how, how does one know what the trade secret is in those very broad descriptions? Where is there anywhere in the record where the judge says, where you say on behalf of your clients, not you, you know what I'm saying? Like metaphor, like where your clients say, these, these are our secrets. And where she says, that's a trade secret. Your Honor, the information here was vast amount of information that was misappropriated. So while Judge Bassoon does use broad character, broad categories of information in the order, she then cites to the record showing precisely what makes up a formula. Well, you tell us, tell us now, because I, I'm, I'm, you know, I'm having some trouble. I mean, I have a, I don't, candidly, there was, there's a, there's a lot of bad action here, it looks like, which clearly Judge Bassoon thought was more than troubling, you know, that Ms. Lacayo walked out and walked out with a whole bunch of information. And the notion that none of that was secret, and it was all public, and that, and that the folks that, on the defense side were just, could easily reverse engineered it, but instead they chose to hire these people. I mean, I understand your side of this piece, and I understand, I think, why Judge Bassoon found it disturbing the behavior that the defendants engaged in. And yet, I'm still wondering, as Mr. Hicks is indicating, what exactly is the trade secret? So we'll start with one, the formulas. And although there is no legal support that would require Mallett to introduce its formulas, it did just that. Into the record, from Bates numbers 4889 to 5002, Mallett introduced the 124 formulas that Ms. Lacayo took with her. And those formulas don't just include the general ingredients for a Mallett product. If you look at those documents in the record, what they do is identify the products, the precise amount of ingredients used in each formula, and then very specific information on the degrees in which they're heated, the method in which they're mixed, the time that they are mixed, the order in which they are mixed, the viscosity, the gravity. There's no information in that 13,000 page record that any one of these formulas was ever disclosed to the public, ever. Well, Mr. Hicks- Well, that's a difficult proposition. Let me ask you this question. If I'm understanding your last statement, some of what you're alluding to are product specification sheets, right? And the assertion by your adversary is that some of those product specification sheets were on the website. Now, you would agree with the proposition that if a product specification sheet is on the website, that's antithetical to any notion of trade secret, right? You'd agree with that proposition? Yes, Judge, I would agree with that proposition. So if you agree with that proposition, then that would mean that anything, any product specification sheet that in fact was on a website, there would be no trade secret. So there have to be some of the 124 formulas that you're alluding to that would have to fall within that category. Am I wrong about that? You are wrong about that only because tell me. The Bates range that I referenced, 4889 to 5002 are the actual formulas that Mallet used to create its products. The product specification sheets are something different. And to complicate matters, something even distinguishable from that are what Mr. Hicks referred to as the safety data sheets. Those are the sheets that Ms. Lacayo testified in her deposition were available online. And those safety data sheets provide information what to do if a user were, for instance, to get an oil mist in your face or disclose that an oil is flammable. I think I need to spend time on that. I hear you and fantastic, but that's not what we're asking. The litany of findings that Judge Jordan just alluded to were from paragraph 41 of the conclusions of law of Judge Bassoon. So the problem that we're having is those discussed categories, some of which under no circumstances could be a trade secret. So for instance, when there's a reference to the supply source for product ingredients, well, we know we have third circuit precedent that says the identity of supply source for product ingredients is not a trade secret. You're familiar with that. So that can't be right to the extent that she referenced that, correct? That's right. Okay. Now she also mentions in that product formulas and what each of us is asking about. And I think that Judge Jordan's characterization, I totally agree with. Some of this does look fishy, but we're all struggling with this notion of what's the trade secret. In that paragraph 41, there's a reference to product pricing. There are two references to pricing, but we're talking about and commodities constantly fluctuate. So if we're talking about historical pricing data, that can't possibly be a trade secret, right? I would agree that the general categories of information that you're referring to, and that Judge Bassoon included in her order, in and of themselves, don't make the specific information a trade secret. What Judge Bassoon did was refer to the specific trade secrets in her order. Where? I'm looking, I'm still looking. The documents that are referred to in the findings of fact and conclusions of law. Yeah. We're asking you for specificity. So 4889 to 5002 are the product formulations. No. In her order. Give it to us in her order. You're saying in her order, she justifies this by identifying specific trade secrets. And we're asking you where? Judge Bassoon incorporates the record. So if the- So if she refers to your 17 volumes of appendix, you're saying that's good enough? If the trade secrets are identified in there, yes. There's no requirement on Judge Bassoon that she goes through- Well, wait, stop for just a second. Are you asserting, Ms. Presley, that an injunction can just say, like the famous ragu commercial, it's in there somewhere? It's the spaghetti sauce, the good stuff, it's in there. Just trust me, it's in there. Isn't our law very clear that injunctions have to be narrowly tailored to prevent the irreparable harm? And that if they're overbroad, they're unsupportable because overbroad injunctions prevent people from doing lawful things. I don't disagree with that. But Judge Bassoon identified, incorporated the findings of fact and conclusions of law into her order. And those findings of fact very clearly articulate by Bates numbers what the trade secrets are. It talks about, by Bates number, the product specification sheets, Mallet's formulas. And it's not, Judge Greenway, back to your point, it's not that Mallet's was contending that the identity of customers itself is a trade secret. What Judge Bassoon did here was make factual determinations as to whether Mallet's customer information was a trade secret. And what appellants want you to do is step into the shoes of the fact finder and analyze Mallet's specific customer information and reach a different conclusion. Well, actually, maybe what they're asking, and Mr. Hicks will speak for statement, customer information, what exactly you're talking about. Because there's a whole lot of customer information that no one would think is a trade secret, right? They're at the address, you know, the product mix that they may have bought in the past, which might be publicly available. There are things that might be confidential, and there are things that might not be. And that leads to another question, which is, is your position that anything that's confidential is a trade secret? No, our position is that the information that was taken by Bowers and Lacayo, that Mallet takes steps to protect, that has value in the hands of a competitor, is a trade secret. It's additionally confidential, but we're not necessarily saying one is. Yeah, they're not, those aren't identical terms, right? Correct. Okay, so sometimes when Judge Bassoon, I don't want to make, she's a superb judge, I don't want to make her an offender for a word, but when she says things like, this is protected material, you know, something could be confidential, it could be protected by contract, or by non-compete, but that doesn't make it a trade secret, right? That's right. Okay. But the converse, the converse is true. If it is a trade secret, it is protectable, and it is confidential. And I think if you, a reasonable reading of Judge Bassoon's order, is that she started out with the highest standard. She looked at the formulas, they're not publicly available, that Mallet protects them, they're trade secrets, and they're confidential. But the problem is that it's written in a way that is too broad and wholesale, right? We started off our discussion on paragraph 41, and I do want to get back to where, in the opinion, you find a specific reference to trade secrets. Now, in the protected materials that Judge Jordan has alluded to, and I have as well, there's a litany, and you and I have already established that some among that litany can't possibly be a trade secret. I don't want to go over that again. But you have mentioned that these 124 formulas and others are trade secrets. And both Judge Jordan and myself have asked you, where is that specifically identified in the findings of fact or conclusions of law? Now, I'm confident you know these backwards and if you want some agreement on this notion that there are trade secrets, we need to know the specificity. Because at the moment, my review doesn't show the specificity that you say is here. So help me on that. So in paragraph eight of her order, the court specifically adopts the contents and record citation. I'm so sorry to interrupt you. Eight of the findings of fact or eight of the conclusions of law? I'm sorry, it's the findings of fact and conclusions of law and order. It's the same document. Yeah, but there's a separate numbering. So if you're going to say paragraph eight, are you talking about paragraph eight under the conclusions of law or paragraph eight under the findings of fact? Paragraph eight under the findings of fact. Okay, I'm looking at it and it says Mallett has established through the course of employment LaCaio had access and was intimately familiar with Mallett's protectable information. The court adopts the contents and record citations in plaintiff's proposed findings at 44 to 60. So what you're saying is she adopted your proposed findings 44 to 60. And if we go to your findings 44 and 60, and we look at everything you referenced and that's everything she referenced and that's specific enough. That's what you're saying. I am your honor. I'm not saying it's an easy process for you, but I'm saying the information is the information is there. Yeah, it's in there somewhere. Okay. In fairness, it's to the district court. It's more than just it's in there somewhere because of the voluminous record and the adoption of findings of fact and references and incorporation. It may take you a step or two to get there. But with that there, the information, including by base numbers, the specific trade secrets, they are identified by the district court and they were misappropriated. Well, let me ask you this. If I can turn to this for a moment, we've, we've given you your extra time, but I do have an additional question. My colleagues might have more questions too. The bond here was $500,000. If I read the record correctly, that was a number that your site suggested based on LaCaia and Bowers' salaries. How is that an appropriate measure for the potential harm to the defendants of an injunction? LaCaia and Bowers' salary. How is that a rational basis on which to say, this is the harm that will flow to the defendants from an injunction? Well, in having the bond, the third circuit doesn't ask the district court or direct the district court to just help to calculate the potential harm. No. In fact, we do ask them to estimate that because the injunction, the measure of the injury is going to be pegged at that bond. They're not going to be able to get more out of you than the bond. And so we do want to know what's the harm, the potential harm to the defendant. I think that's the law and you can accept for the sake of argument that I'm thinking that's the law. And then answer my question, how is the salary for LaCaia and Bowers a rational basis for determining the harm to the defendants from an injunction? The law is recoverable harm. And the $21 million was not shown. That's not my question. You can answer the question you want to answer in a second, but first answer my question. How is the salaries of LaCaia and Bowers a rational basis for pegging the harm to the defendants from an injunction? Your Honor, the harm to LaCaia and Bowers is the harm that could potentially be recoverable from the injunction because the $21 million proposed by appellants is made up in its majority by damages that wouldn't be recoverable. So it is the court's job in assessing the amount of the bond to look at the recoverable damages. And if an injunction is improvidently granted, then the business interruption that the defendants are alluding to would indeed be recoverable. So help me with that notion. So the business interruption in this case was calculated by the appellants who bear the burden of showing the bond amount at $300,000. They talked about the sales that were lost. They talked about the 11 employees who would be essentially out on the street because the I have with it is that it's not pegged to the overlap of business with Mallet. It's much broader than that. So there is business that Bundy engages in that is not competitive necessarily with Mallet. And yet the injunction appears to reach that. Now that's the problem. Well, first, Judge Greenaway, the amount of the bond attributable by appellants to employees is the severance amounts that the appellants would pay to the employees for being out of work. There was no evidence in the record or elicited through witness testimony showing that these employees had agreements that required severance, that they were legally required severance. It was just a million dollar figure saying, if we have to close, we are going to give our employees severance. The vast majority of the $21 million is business debt. Business debt that falls due because they can't cover their costs because they're out of business. And your assertion is that's just not recoverable. So forget it. So LaKyle and Bowers's salary, that's the right measure. That's the position you took in the district court and correct. Okay. All right. Well, then I believe we've got your argument. Judge Sirica, do you have further questions? I think he does. We've said in this circuit that reverse engineering means starting with the known product and working backwards to divine the process, which aided in its manufacturer. And we know what Judge Bassoon said about this. What are the specifics? Your opponent claims that this is common in the industry and that they were able to find out these formula or processes entirely through reverse engineering. And where is the analysis in the findings of fact as to why that is not so? Well, there's no finding of fact with respect to Vegalube SuperP being reverse engineered by anyone, Sanova aside. And that's because that's not in the record. There's no evidence in the record that a single mallet product was ever reverse engineered. And in fact, the testimony from mallet witnesses are that they don't reverse engineer products. And to their knowledge, none of their products have ever been reverse engineered. And the critical testimony here, Your Honors, is that Bob Bundy testified that mallet products could be reverse engineered to determine the ingredients. And those ingredients, as Judge Greenaway pointed out, are publicly available. They're on the label. Having the ingredients doesn't give you the formula to make the process. What Sanova would have had to show exactly what you alluded to, Judge Sirica, is that you could take the product, take it apart, and remake it with the processes. And there's not a shred of evidence in the record showing that that was done or could be done to any singular mallet product. I think Bundy used the term general ingredients. Did he not? He did. But the ingredients, again, they're disclosed. They're disclosed in our public information. Yeah, I think we get it. I understand the point you're making is you can know what's in there, but you don't know how it's in, when it's added, the means for adding it. You can have a recipe on the side of a box and get a lousy cake, but a good cook knows how to do it. And there's a process that's not widely known. I'm not doing justice to your argument, but that's the gist of it, right? It is. Okay, thanks. All right, if my colleagues are finished with your side of this, Ms. Presley, we'll give the podium back to Mr. Hicks for his rebuttal. Thank you, Your Honor. I think it's important for the panel to understand that the appellants do not and are not opposed to it. It's confidential, protected, or trade secret. We agree with the panel that we don't know what it is they want, but we've always indicated to them that they can have it back. And I think it's important for the panel to understand that the information that Ms. Presley referred to is in a box of documents that are sitting in Otto LaCaia's former counsel's office. And they have been sitting there for over a year and a half, and they've never been asked to be returned to them. The by your client? They have not been viewed by her, according to paragraph five of the injunction order, since the time she turned them over to her counsel in May of 2020. And before then, they were not reviewed. In fact, she didn't even know that she had the information in her garage. These were boxes that she accumulated while she had worked for Mallet and other companies over the years, and they were sitting in her garage in Pittsburgh while she was working for us in Columbus. There's no evidence that she ever accessed any of this information while working for us, which is why I think it's critical for the court. You make it sound like it's all in a box someplace in Pittsburgh, but a vast store of this information she took digitally. She emailed herself huge volumes of documents. She downloaded things onto USB drives and took them with her. I mean, we're way past the time when somebody can say it's in a box in the garage. I mean, she had access to this stuff because it was digital, right? Yes and no. Again, it was in her Gmail account, which she readily acknowledged that she had, and she was asking Mallet, how do I get your information away from my personal information? Because that was a personal Gmail account that had a lot of other information. But with regard to the USBs, she also testified that the USBs that she was able to find were again, just for the sake of discussion for a minute here, that all of that stuff that she decided at the last minute, you know what? I just think I'm going to take thousands and thousands and thousands of internal documents from my employer, who I'm not telling I'm leaving to go to a new competitor. That in there are documents that are confidential, and she was under a confidentiality agreement. In there are documents that would help compete. She was under non-compete. And then in there's probably something that would count as a trade secret. Assume that for the sake of discussion. The fact that she hasn't looked at the box in Pittsburgh doesn't mean she hasn't engaged in a misappropriation and that the knock-on effects of that, the use of that aren't a real harm to her former employer, right? I mean, that's the injunction is designed to stop the harm to mallet of what her information taken beyond her know-how, but stuff that was internal for mallet. And now they've got it and now they're using it. Isn't an injunction an appropriate way to try to say, you don't get to keep using that. Absolutely. I don't disagree with that, but that's not what this injunction did. If this injunction just simply required her to return that information to mallet, which she's been willing to do, and it's been sitting in her council's office now for over a year and a half, then the injunction would be fine. But that's not what this injunction did. This injunction went well beyond that. It is banning her from the release agent market, even though her covenant had expired in February, 2021. It bans Mr. Bowers, who has no in the release agent business. And it bans my client who has been in the baking industry for over 50 years. My clients know all of these customers. In fact, they introduced mallet to these customers. It's telling us we can't be in the release agent business. We can't use all the knowledge that we have. And we've known about before we hired Ms. Lakai and Mr. Bowers. We're being punished for that. And that's what's wrong with this injunction. Judge Greenway's got a question for you, Mr. Harris. I'd like you to respond to your adversary's comment with regard to paragraph eight of the findings of fact. If I understood her argument, essentially, if we look at paragraph eight, that encapsulates the scope of the trade secret, and I just wanted you to comment on that. Again, Your Honor, that's the overall problem with this injunction order. What Judge Bassoon did was simply just wholesale adopt the findings of fact without any specific record, without any analysis as to whether or not these really do constitute trade secrets. As you pointed out, customer names, customer information, customer history, pricing information from 2012, or even earlier, doesn't constitute trade secrets. Yet, Judge Bassoon just wholesale adopted that. Now, if my client is reading this order, and we went back to Judge Bassoon on this and said, well, wait a minute, what is it you're actually barring us from doing? Are we not allowed to sell release agents in businesses in which mallet doesn't compete? And she has said, yes. So my client is supposed to go through all of these paragraphs and try to figure out what constitutes a trade secret. And yet, when we look at it, and you look through all these documents, what they're referring to are the boxes that are sitting in a garage in Pittsburgh. That's what she's referring to. And that's not trade secret information. That's historical information that Ms. Lakia has acquired over the 25, or actually 40 years that she's been working in the commercial baking industry, only a limited amount of time that she worked in mallet. All right, thanks. And that goes back to my issue about the fact that there is- We got you, Mr. Hicks. We got you. Thank you, Your Honor. All right. Judge Greenaway or Judge Siric, any further questions? No, sir. Okay. We thank counsel for your argument today. We've got it under advisement. We understand this is important to both sides in this case, and we'll get back to you as soon as we reasonably can. Thank you, Your Honor. For now, we recess court, okay?